**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 23-cr-394 (TNM)** |
| v. | : | |
| | : | |
| **DEFENDANT #1,[1]** | : | |
| **RONNIE ROGERS,** | : | |
| **WAYNE GLYMPH,** | : | |
| **RICKY JACKSON,** | : | |
| **DEFENDANT #5,** | : | |
| **KEVIN QUATTLEBAUM,** | : | |
| **MICHAEL OWENS, and** | : | |
| **MICHAEL STEWART,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OMNIBUS MEMORANDUM**
**IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion for detention pending trial for the following defendants who, as of the morning of December 4, 2023, have not advised the government that they are conceding detention—to wit:  Wayne GLYMPH, Ricky JACKSON, Kevin QUATTLEBAUM, and Michael STEWART.  The other defendants who have been arrested have consented to detention.

This case is a sprawling drug distribution conspiracy, spanning multiple states, involving large quantities of multiple controlled substances.  The evidence against each defendant—gathered from extensive Title III wiretaps, drug shipment seizures, and controlled purchases—is substantial.  All eight defendants have been deeply involved in at least one of two charged conspiracies to

---

[1] Defendant #1 and Defendant #5 are not being identified because they have not yet been arrested, and the case against them remains under seal.

distribute fentanyl, heroin, cocaine, and cocaine base; all eight are very experienced drug traffickers with extensive criminal histories; and all eight present a danger to the community by virtue of their trafficking in dangerous controlled substances and as evidenced by their criminal histories.

Moreover, based on the charged offenses, each of the above-named defendants faces a rebuttable presumption that no conditions or combinations thereof can effectively ensure the defendants' appearance in this case and otherwise protect the community, pursuant to 18 U.S.C. § 3142(e)(3)(A).

The Government respectfully requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2021, the DEA Washington Division Group 10 commenced an investigation into a drug-trafficking organization in which the indicted defendants are members. Starting in July 2021, the DEA conducted numerous controlled purchases of fentanyl from Michael STEWART that amounted to approximately 320 grams. As this investigation progressed, numerous other members of this conspiracy were identified using Title III wiretaps of cellular telephones belonging to members of the conspiracy, including STEWART, Ronnie ROGERS, and Wayne GLYMPH, as well as with law enforcement intelligence, pen registers analysis, surveillance, confidential source debriefings, and criminal history analysis. Some of these members are the indicted defendants, including ROGERS, GLYMPH, Michael OWENS, Ricky JACKSON, STEWART and QUATTLEBAUM.

Between October 2022 and June 2023, Judge Amy Berman Jackson authorized the interception of wire and electronic communications to and from six cellular telephones.  Over the course of the monitoring periods, law enforcement intercepted communications involving each defendant discussing the procurement, cut, sale of, and payment for, large quantities of narcotics, particularly fentanyl, cocaine and cocaine base.  Using communications over the court-ordered Title III intercepts, and with assistance from partner law enforcement agencies, as well as other sources, DEA has seized over eight kilograms of fentanyl secreted in parcels shipped through various carriers, to include the U.S. Postal Service, FedEx, and UPS.

On November 9, 2023, the Grand Jury handed up an Indictment charging the Defendants with numerous felony offenses, as follows:

| Count | Defendant(s) | Approx. Date(s) of Offense | Charge |
|---|---|---|---|
| One | DEFENDANT #1 RONNIE ROGERS WAYNE GLYMPH MICHAEL STEWART RICKY JACKSON MICHAEL OWENS DEFENDANT #5 | July 2021 – November 2023 | 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Four Hundred Grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl and One Hundred Grams or More of Heroin) |
| Two | KEVIN QUATTLEBAUM RONNIE ROGERS DEFENDANT #5 MICHAEL STEWART MICHAEL OWENS | August 2022 – November 2023 | 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Five Hundred Grams or More of a Mixture and Substance Containing a Detectable Amount of Cocaine, and a Detectable Amount of Cocaine Base) |
| Three | MICHAEL STEWART | July 15, 2021 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Unlawful Distribution of a Mixture and Substance Containing a Detectable Amount of Fentanyl) |

| Count | Defendant(s) | Approx. Date(s) of Offense | Charge |
|-------|--------------|---------------------------|--------|
| Four | MICHAEL STEWART | August 17, 2021 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Unlawful Distribution of a Mixture and Substance Containing a Detectable Amount of Fentanyl) |
| Five | MICHAEL STEWART | August 17, 2021 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi) (Unlawful Possession with Intent to Distribute Forty Grams or More of Fentanyl) |
| Six | MICHAEL STEWART | November 18, 2021 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Unlawful Distribution of a Mixture and Substance Containing a Detectable Amount of Fentanyl) |
| Seven | MICHAEL STEWART | February 10, 2022 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi) (Unlawful Distribution of Forty Grams or More of Fentanyl) |
| Eight | MICHAEL STEWART | April 29, 2022 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Unlawful Distribution of a Mixture and Substance Containing a Detectable Amount of Fentanyl) |
| Nine | MICHAEL STEWART | April 29, 2022 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Unlawful Distribution of a Mixture and Substance Containing a Detectable Amount of Fentanyl) |
| Ten | RONNIE ROGERS | July 27, 2022 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi) (Unlawful Distribution of Forty Grams or More of Fentanyl) |
| Eleven | MICHAEL STEWART | July 27, 2022 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi) (Unlawful Distribution of Forty Grams or More of Fentanyl) |
| Twelve | RONNIE ROGERS | August 4, 2022 | 21 U.S.C. § 846 (Attempted Unlawful Possession with Intent to Distribute Four Hundred Grams or More of Fentanyl) |
| Thirteen | RONNIE ROGERS | September 2, 2022 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi) (Unlawful Distribution of Forty Grams or More of Fentanyl) |

| Count | Defendant(s) | Approx. Date(s) of Offense | Charge |
|---|---|---|---|
| Fourteen | MICHAEL STEWART | September 8, 2022 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi) (Unlawful Distribution of Forty Grams or More of Fentanyl) |
| Fifteen | RONNIE ROGERS | December 19, 2022 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi) (Unlawful Possession with Intent to Distribute Four Hundred Grams or More of Fentanyl) |
| Sixteen | RONNIE ROGERS | April 26, 2023 | 21 U.S.C. § 846 (Attempted Unlawful Possession with Intent to Distribute Four Hundred Grams or More of Fentanyl) |
| Seventeen | RONNIE ROGERS | July 5, 2023 | 21 U.S.C. § 846 (Attempted Unlawful Possession with Intent to Distribute One Hundred Grams or More of Heroin) |
| Eighteen | RONNIE ROGERS | July 20, 2023 | 21 U.S.C. § 846 (Attempted Unlawful Possession with Intent to Distribute Four Hundred Grams or More of Fentanyl) |
| Nineteen | RONNIE ROGERS | October 2, 2023 | 21 U.S.C. § 846 (Attempted Unlawful Possession with Intent to Distribute Four Hundred Grams or More of Fentanyl) |

**The Fentanyl Conspiracy and the Cocaine Conspiracy**

As the charges indicate, this case involves two conspiracies, with overlapping membership: (1) the fentanyl and heroin conspiracy, charged in Count One; and (2) the cocaine and cocaine base conspiracy, charged in Count Two.

The fentanyl conspiracy involved Defendant #1, Ronnie ROGERS, Wayne GLYMPH, Michael STEWART, Ricky JACKSON, Michael OWENS, and Defendant #5.  Defendant #1 was brokering shipments of fentanyl to the DC area on behalf of ROGERS and GLYMPH.  ROGERS and GLYMPH would then cut and repackage these large shipments of fentanyl, supplying

redistributors in the area.  STEWART, JACKSON, and OWENS were supplied by ROGERS, and then redistributed the fentanyl to other redistributors and to end users.

The cocaine conspiracy involved Kevin QUATTLEBAUM, Ronnie ROGERS, Defendant #5, Michael STEWART, and MICHAEL OWENS.  QUATTLEBAUM was the source of supply for cocaine; as in the fentanyl conspiracy, ROGERS parceled out large quantities of cocaine to Defendant #5, STEWART, and OWENS for redistribution.

### Seized Contraband During the Conspiracies

Both conspiracies dealt in kilogram quantities of drugs and were supported by firearms. Law enforcement, through the execution of search warrants, the interception of packages, and controlled buys, has recovered more than nine kilograms of fentanyl, more than eight kilograms of cocaine, and eight firearms, as well as over $70,000 in cash and money orders.

    *1.  The Controlled Purchases*

The investigation began with a series of controlled purchases of fentanyl from Defendant Michael STEWART.  Law enforcement officers received information that STEWART had heroin/fentanyl for sale on a wholesale basis for $50 to $60 per gram.  Over the course of approximately 14 months, law enforcement conducted seven controlled purchases of suspected heroin/fentanyl (which test results confirmed contained fentanyl) totaling approximately 320 grams.  On each occasion, which is evidenced through recorded telephone calls and/or meetings and surveillance, STEWART personally supplied the fentanyl and exchanged it for cash.  Table 1, below, shows the dates, locations, amounts, and cost of the controlled purchases from STEWART.

**TABLE 1 – Controlled Purchases from Michael STEWART**

| Buy No. | Date | Location | Controlled Substance | Total Quantity (grams) | Cost |
|---|---|---|---|---|---|
| 1 | July 15, 2021 | NE, Washington, DC | Fentanyl | 29.91 | $ 1,500.00 |
| 2 | August 17, 2021 | NE, Washington, DC | Fentanyl | 29.8 | $ 1,800.00 |

| 3 | November 28, 2021 | NE, Washington, DC | Fentanyl & Heroin | 29.85 | $ 1,800.00 |
| 4 | February 10, 2022 | NE, Washington, DC | Fentanyl | 49.79 | $ 3,000.00 |
| 5 | April 29, 2022 | NE, Washington, DC | Fentanyl | 59.9 | $ 3,600.00 |
| 6 | July 27, 2022 | NE, Washington, DC | Fentanyl | 61.173 | $ 3,600.00 |
| 7 | September 8, 2022 | NE, Washington, DC | Fentanyl | 59.76 | $ 3,600.00 |

### 2. Intercepted Packages

As a result of the buys, law enforcement conducted a series of Title III wiretaps on STEWART, ROGERS, GLYMPH, and others. Pen register records on STEWART's calls reflected that in the periods surrounding at least some of the controlled purchases, STEWART made frequent contact with a phone number subscribed to Ronnie Rogers at 6501 Gateway Blvd., District Heights, Maryland. Communications intercepted between STEWART and ROGERS also established that ROGERS was the supplier of fentanyl to STEWART with respect to at least Buys 6 and 7 in Table 1.

The wiretaps also established that ROGERS and GLYMPH were receiving shipments of fentanyl, sent via USPS, FedEx, and UPS; and were shipping cash and USPS money orders. Based on analysis of intercepted communications, shipping records, and information obtained from other sources, law enforcement identified and seized multiple large shipments of controlled substances to the DC area, as well as money orders and cash shipped out of the DC area by members of the conspiracy. Table 2, below, shows the dates, drug quantities, locations, and names associated with the seized packages of drugs, totaling over eight kilograms.

**TABLE 2 – Seized Shipments of Fentanyl and Heroin Sent to Members of the Conspiracy**

| No. | Date of Seizure | Addressee | Significance of Address | Controlled Substance | Approx. Quantity (grams) |
|---|---|---|---|---|---|
| 1 | August 4, 2022 | James Rogers, 1221 Massachusetts Ave., NW, Apt 705 | Apartment of Ronnie ROGERS | Fentanyl | 999 |

| No. | Date of Seizure | Addressee | Significance of Address | Controlled Substance | Approx. Quantity (grams) |
|---|---|---|---|---|---|
| 2 | October 26, 2022 | Gregory Stephenson, 6507 Foster St., District Heights, MD 20747 | Around the corner from ROGERS' residence at 6501 Gateway Blvd., District Heights, MD | Fentanyl | 982 |
| 3 | October 29, 2022 | Juan Lopez, 6508 Gateway Boulevard, District Heights, MD 20747 | Located across the street and within eyesight of ROGERS' residence at 6501 Gateway Boulevard | Fentanyl | 996 |
| 4 | April 26, 2023 | Bethany Stephenson, 844 50th Pl. NE | ROGERS/GLYMPH suspected stash house for conspiracy | Fentanyl | 551 |
| 5 | July 5, 2023 | Raul Ortega, 844 50th Place, NE | ROGERS/GLYMPH suspected stash house for conspiracy | Heroin | 236 |
| 6 | July 20, 2023 | Tom Gray, 844 50th Place, NE | ROGERS/GLYMPH suspected stash house for conspiracy | Fentanyl | 874 |
| 7 | October 9, 2023 | Damana Pepudro, 844 50th Place, NE | ROGERS/GLYMPH suspected stash house for members of conspiracy | Fentanyl | 2000 |
| 8 | October 17, 2023 | Bethany Hamilton, 6501 Gateway Boulevard, District Heights, MD 20747 | ROGERS residence | Fentanyl | 1000 |
| 9 | November 29, 2023 | Elijah Stephenson, 2168 Pineview Ct., Waldorf, MD 20601 | Residence/business of April SHORT, girlfriend and employer of Wayne GLYMPH | Fentanyl | 1000 |

Just as members of the conspiracy arranged for controlled substances to be shipped to them in the DC area, members of the conspiracy also shipped and caused to be shipped monetary instruments, including cash and USPS money orders, in large amounts, as drug payments.  Law enforcement intercepted three packages containing monetary instruments, totaling more than $13,000, as reflected in Table 3, below.

**TABLE 3 – Seized Shipments of Monetary Instruments from Members of the Conspiracy**

| No. | Date of Seizure | Return Address | Significance of Return Address | Monetary Instrument | Value |
|---|---|---|---|---|---|
| 1 | January 9, 2023 | Gregory Jones, 106 50th Street NW | Address and subscriber associated with Ronnie ROGERS' cell phone number | Blank USPS money orders | $5,000 |
| 2 | March 9, 2023 | Wayne Jones, 106 50th Street NE | Address associated with Ronnie ROGERS' cell phone number | Cash | $7,880 |
| 3 | August 9, 2023 | David Bay, 844 50th Street NE | Suspected stash house for members of conspiracy | Blank USPS money order | $1,000 |

3.  *Seizures in the Execution of Search Warrants*

On the morning of November 29, 2023, law enforcement executed search warrants at numerous locations in DC and Maryland associated with Defendants.  The results of the search (seizing eight firearms, more than eight kilograms of cocaine, multiple ounces of fentanyl, bulk cash in excess of $60,000, electronic money counters, and drug paraphernalia for packaging) confirm that the drug organization is sophisticated, and that members of the conspiracy have access to firearms and narcotics and store these items scattered in various residences across their area of operations.  As non-exhaustive examples:

- A search of 1221 Massachusetts Ave. NW #705, a residence of Ronnie ROGERS, resulted in the recovery of three handguns, between two and three kilograms of cocaine, and $23,000 in bulk cash;

- A search of 6501 Gateway Boulevard, District Heights, Maryland, a stash house and residence for ROGERS, resulted in the recovery of three more handguns, several ounces of fentanyl, and over $1,500 in cash;

- A search of 8811 Lottsford Rd., Apt. 444, Upper Marlboro, Maryland, the apartment being leased by Kevin QUATTLEBAUM and his wife, and in which QUATTLEBAUM was arrested, resulted in the recovery of at least six kilograms of cocaine, an FN 5.7 mm high velocity handgun capable of penetrating body armor, and over $35,000 in bulk cash.

- A search of 2168 Pineview Ct., Waldorf, Maryland, the business address of April Short, the girlfriend and employer of defendant Wayne GLYMPH, and GLYMPH's alleged

place of employment, resulted in the recovery of a FedEx package delivered on November 29, 2023, that contained approximately one kilogram of a substance that tested positive for fentanyl.

### Defendants GLYMPH, STEWART, and JACKSON, and QUATTLEBAUM's Involvement in the Conspiracy

**1.  *Wayne GLYMPH***

As noted above, Wayne GLYMPH was at least a hierarchal equal and a co-conspirator of Ronnie ROGERS and a major trafficker of fentanyl.  GLYMPH was instrumental in the coordination of major drug shipments.  On October 17, 2022, Judge Amy Berman Jackson of the United States District Court for the District of Columbia signed an Order authorizing the interception of wire and electronic communications to and from a cellular telephone with the phone number (202) 890-9094 (hereinafter Target Telephone #2 or TT-2) which was being utilized by ROGERS for the purpose of furthering the sale of narcotics.  Monitoring of the communications commenced on October 18, 2022, and concluded on November 16, 2022.  During this monitoring period, it became apparent that ROGERS and GLYMPH were coordinating the shipment of kilogram quantities of fentanyl to the Washington, DC metropolitan area.

During court-authorized intercepts of telephone conversations between Defendants ROGERS, GLYMPH, and others, law enforcement learned that the Defendants had been engaged in a conspiracy to distribute fentanyl, heroin and cocaine and laundering the proceeds thereof.  The calls described below are selected examples of a larger set of phone calls.

### a.  *Package of Kilogram of Fentanyl Seized on October 26, 2022*

For example, in October 2022, in reference to the kilogram of fentanyl listed as No. 2 in Table 2, above, law enforcement intercepted numerous phone calls between GLYMPH and ROGERS regarding their anticipation of the packaged fentanyl.

On October 22, 2022, at approximately 11:12 A.M., ROGERS received an incoming call from GLYMPH using (202) 904-3911 (hereinafter Target Telephone #3 or TT-3). ROGERS asked GLYMPH, "Are you getting him all the information they need?" GLYMPH replied, "Yeah." ROGERS then asked, "Well, they send you a tracking yet?" GLYMPH told ROGERS, "Nope." ROGERS said, "Ok, well then…. when we get a tracking, I can know when to go round there and sit there, you know what I'm saying."

Several hours later, ROGERS made an outgoing call on TT-2 to GLYMPH, who was utilizing TT-3. At approximately 4:14 P.M., GLYMPH said to ROGERS, "We going out uhh at the latest Tuesday, at the earliest Monday morning we be in the mail." ROGERS replied, "Oh, ok. As soon as you get it let me know something…"

On October 25, 2022, at approximately 2:59 P.M., ROGERS received an incoming call from GLYMPH on TT-3. GLYMPH told ROGERS, "Aight, he said he'll send the receipt, it's, it's out." ROGERS asked GLYMPH, "What happen?" GLYMPH said, "He said, it's out, it's already gone."

Later that day, at approximately 3:27 P.M., ROGERS received an incoming picture message from GLYMPH, utilizing TT-3. ROGERS received a picture of a shipping label, reproduced below, that was addressed to a "Gregory Stephenson" at "6507 Foster, District Heights, MD 20747." The parcel was being shipped via UPS and was bearing the tracking number 1Z5XW8740153708431.



On the morning of October 26, 2022, members of DEA Group 10 and members of the Prince George's County Police Department (PGPD) Narcotics Enforcement Section located a parcel shipped from California and addressed to a "Gregory Stephenson" at 6507 Foster, District Heights, Maryland 20747-2240, bearing the tracking number 1Z5XW8740153708431.  A drug dog alerted on the package.

Following the positive alert, and at the request of case agents, members of the PGPD obtained a Maryland State search warrant authorizing the search and seizure of the parcel.  The contents of the parcel were in a heavily taped cardboard box, which contained another white cardboard box, which contained a baby bottle purifier.



Inside the baby bottle purifier was a vacuum sealed bag of white powder.



A field test was conducted on the vacuum sealed bag of white power and the results were positive for the presence of fentanyl. Subsequent lab analysis confirmed a net weight of 982 grams ± 1 gram and the presence of fentanyl with a purity of 65% ± 5%.

Several hours before the package was seized, ROGERS called GLYMPH. That same morning, surveillance units observed GLYMPH driving his 2015 Black Audi Q7 (DC Tags GN9885) driving by 6507 Foster St. At approximately 11:42 a.m., surveillance units observed GLYMPH park in front of the delivery address for the seized package. At about the time he was picked up on surveillance, GLYMPH called ROGERS and said he was in the neighborhood.

Additionally, on October 26, 2022, on three occasions from 10:00 p.m. to midnight, the user of an IP address associated with Wayne GLYMPH at 7620 Knotting Hill Lane, Port Tobacco, Maryland, in name of GLYMPH's girlfriend, April Short, checked tracking information on the seized package.

On October 28, 2022, two days after the fentanyl package was seized, ROGERS received an incoming call from GLYMPH, who was using TT-3.  GLYMPH told ROGERS, "Yeah, I'm moving around, I'm posed to be uh, getting a new picture for us, so that's what I'm waiting on." ROGERS replied, "Yeah, I'm, I'm doing the same thing… Let me call you back."   In this conversation, GLYMPH was telling ROGERS he is waiting on another "picture"—meaning a photograph with tracking information for another parcel containing illegal narcotics.  ROGERS told GLYMPH that he was doing the same thing.

These exchanges concerning the seized package demonstrate that GLYMPH was aware of and intimately involved with the shipment and delivery of approximately one kilogram of fentanyl.

       *b.  Package of Kilogram of Fentanyl Seized on November 29, 2023*

Following GLYMPH's arrest in this case, in the execution of a search warrant, law enforcement seized a package containing welding equipment and approximately one kilogram of a substance that field-tested positive for fentanyl.  The package was addressed to Elijah Stephenson, 2168 Pineview Ct., Waldorf, MD 20601.  This address is associated with April Short, GLYMPH's girlfriend, who was with GLYMPH at the time of his arrest; no person named Elijah Stephenson lives at the address.  As reflected in Table 2, the name "Stephenson" has been used in the shipment of other fentanyl packages seized in this case.

### 2. Ricky JACKSON

Defendant Ricky JACKSON was a major redistributor of fentanyl for ROGERS. JACKSON used, and was the registered subscriber for, telephone number (202) 891-1398, which was a frequent contact of ROGERS during multiple monitoring periods.  ROGERS supplied JACKSON with "bundles" of two-gram quantities of fentanyl.  Each "bundle" was divided into 10 individual packages of 0.2 grams each.  Based on intercepted telephone communications between JACKSON and ROGERS, JACKSON was supplied approximately 10 to 12 bundles (or 20 to 24 grams of fentanyl) five or six times each week.  JACKSON would then redistribute the fentanyl in certain areas of Good Hope Road SE, in the vicinity of methadone clinics that treat opioid addicts.  JACKSON's relationship with ROGERS was in existence at least by August 2021.

Intercepted calls—of which the following are merely examples—establish that ROGERS and JACKSON checked in on a near-daily basis to discuss fentanyl sales.  On October 21, 2022, ROGERS called JACKSON and asked him if he had "enough" for the morning, consistent with ROGERS's practice of checking in with JACKSON either late at night or first thing in the morning. JACKSON said yes, and that he liked what he had been supplied and wanted more of it.  ROGERS asked if JACKSON had cut it once or twice, to which JACKSON responded that he cut it "one to one."  JACKSON joked with ROGERS that "that shit got my big ass down," meaning that it was very potent when JACKSON himself tested it.  ROGERS noted in response that that was what they were working with.

The following day, October 22, 2022, ROGERS asked JACKSON if he "liked that thing I brought you," to which JACKSON replied that he did, and that it was not like the one he received yesterday from ROGERS, suggesting that that he had received an entirely new batch of fentanyl.

He indicated that that was what they were working with for the foreseeable future, identifying it as "the gray."

The very next day, October 23, 2022, ROGERS told JACKSON that he was putting something together for later that evening.  JACKSON responded that the latest shipment he received from ROGERS "in the little black bag" was not "shit," or potent, indicating yet another distinct batch of fentanyl.

On October 26, 2022, JACKSON appeared to refer to yet another batch of fentanyl, when he said that "they didn't like that other thing like that."  ROGERS asked whether that was "the white," to which JACKSON replied that it was, and that one of the testers did not care very much for it.

Later on in the monitoring period, on October 27, 2022, ROGERS called JACKSON at 5:04 p.m. and asked him, "how many you got left," to which JACKSON responded that he had seven or eight, an apparent reference to bundles (equivalent to 14 to 16 grams), to which ROGERS responded that that was "a lot left," meaning that he would have expected JACKSON to have sold more bundles by that point in the day.  JACKSON explained that he was aware of this and suggested that some of his "people" were not able to pay because it was the end of the month, meaning that they were out of money and had spent it all as government assistance checks typically are issued on the first of the month.

However, JACKSON appeared to have sold through his inventory by the following morning.  On October 28, 2022, JACKSON called ROGERS at 6:17 a.m., confirmed he was selling fentanyl by the clinic, and then said he had "a bundle left," which, based on all other evidence, would be a very small amount of fentanyl (2 grams, 10 bags total) with which to start off the day.

ROGERS promised that he would come and meet him, apparently for the purpose of resupplying him.

JACKSON's high daily volume of fentanyl sales illustrate his role as a top lieutenant in the conspiracy.

### 3. Michael STEWART

Defendant Michael STEWART was another redistributor of controlled substances for Ronnie ROGERS.  As noted earlier and as more fully discussed below, law enforcement conducted seven controlled purchases of fentanyl from STEWART that amounted to approximately a third of kilogram of fentanyl.  After each controlled purchase, STEWART was positively identified as the supplier of fentanyl and STEWART utilized vehicles that were registered to him at his known residence.  The purchases were also corroborated and evidenced by other means such as recorded telephone calls, recorded conversations and surveillance.  All of the substances purchased from STEWART were tested at a DEA's Mid-Atlantic Laboratory and determined, after forensic chemical analysis, to be fentanyl (with one also containing heroin).

On July 15, 2021, the DEA conducted a controlled purchase of 30 grams of fentanyl from STEWART.  STEWART arrived at the deal location operating a tan colored Cadillac SRX registered to STEWART at his known address on Dix St. NE, Washington, DC 20019.

On August 17, 2021, the DEA conducted another controlled purchase of 30 grams of fentanyl from STEWART.  STEWART was observed operating a tan colored GMC Yukon registered to STEWART at his known residence on Dix St. NE, Washington, DC 20019. Following the transaction, STEWART commented that he had sold approximately 80 grams of narcotics already that day, declaring, "That's what I do."

The DEA conducted five additional controlled purchases, as reflected in Table 1.  In total, through these operations, STEWART sold approximately 320 grams of fentanyl.

At least two of controlled purchases of heroin were supplied by ROGERS to STEWART. On August 24, 2022, law enforcement began intercepting electronic and wire communications coming to and from (240) 426-4352 (hereinafter Target Telephone #1 or TT-1), used by STEWART.  During this monitoring period, law enforcement identified ROGERS as a STEWART source of supply for fentanyl.  On September 8, 2023, law enforcement conducted a controlled purchase of 60 grams of fentanyl from STEWART.  Immediately after the 60 grams of fentanyl was ordered from STEWART, STEWART contacted ROGERS and requested the same amount of fentanyl he acquired from ROGERS for the July 27, 2022 deal.

On September 2, 2022, while monitoring intercepted communications on TT-1, ROGERS told STEWART that he would deliver the requested fentanyl that day.  STEWART told ROGERS that he was "in the house."  At approximately 1:15 pm, surveillance observed a silver Ford Transit Van bearing a Washington, D.C. registration park on the street in front of STEWART's home. ROGERS was observed exiting he vehicle and walking toward STEWART's home.  As this was occurring, law enforcement was intercepting a call between STEWART and another individual. On the call, law enforcement could hear knocking in the background.  STEWART then said, "I think that Ronnie."  STEWART could then be heard saying, "What's up Ron?"  As the background conversation continued, ROGERS could be heard asking STEWART if he had a scale. STEWART said that he did before telling the other subject that he was talking to, he would call her back.  Several minutes later, surveillance observed ROGERS leaving STEWART's home.

STEWART was also distributing cocaine with Kevin QUATTLEBAUM and others, and intercepted communications establish that QUATTLEBAUM was a source of supply of cocaine

to STEWART.  For example, on September 7, 2022, QUATTLEBAUM called STEWART to arrange a delivery of cocaine to STEWART.  STEWART told QUATTLEBAUM, "I need you like cooked food, man."  QUATTLEBAUM replied, "The soft way?"  STEWART answered, "Yeah. So, I am getting ready, huh?"  QUATTLEBAUM offered, "I got the hard way whipped, too."  STEWART responded, "Nah I don't need that Kevo, I don't need that. Yeah, I don't need that."  The two then coordinated a meeting, which took place later that day.  "The soft way" and "the hard way" refer to different preparations of cocaine—either cocaine powder or cocaine base, respectively; STEWART told QUATTLEBAUM that he wanted cocaine powder and did not need cocaine base that time.

### 4.  Kevin QUATTLEBAUM

In addition to his dealings with STEWART, QUATTLEBAUM was heavily involved in the distribution of cocaine to ROGERS and others.  For example, on March 19, 2023, in a recorded wiretap call, QUATTLEBAUM called ROGERS and ROGERS asked, "Can you, can you bring me that uh."  QUATTLEBAUM said, "Just text it to me, I'll come."  ROGERS replied, "OK, alright, alright, cause if, what, are you through tonight, or can you, or you wanna do it tonight or early in the morning cause I need it early."  QUATTLEBAUM then said, "Naw, I wanna do it today.  Get this shit out of the way."  ROGERS then replied, "Alright, come on, come on, I'm in Maryland, I'm in the house in Maryland."  QUATTLEBAUM told ROGERS, "Okay, just text me, say your way or Mike way.  My way or Mike way."  ROGERS replied, "Mike way, Mike way," and QUATTLEBAUM said, "Oh, okay."  "Mike's way" refers to powder cocaine, and "my way" refers to crack cocaine.  On March 25, 2023 at 2:27 p.m., ROGERS was intercepted calling QUATTLEBAUM and stated, "I'll tell you want you need to do.   Bring me four like Mike." QUATTLEBAUM replied, "Ok, ok."  ROGERS then said, "Same way.   Alright, alright bye."  A

similar exchange occurred on March 30, 2023.  ROGERS called QUATTLEBAUM and asked him to bring ROGERS "one like Mike and one like I do," i.e., one portion of powder cocaine and one of crack.  QUATTLEBAUM replied, "Alright."  Intercepted communications reflect that the two met later that day.

QUATTLEBAUM was arrested on November 29, 2023, in Upper Marlboro, Maryland. When law enforcement entered the residence, they found QUATTLEBAUM to be in possession of approximately six kilograms of cocaine, a high velocity firearm capable of piercing body armor, and over $35,000 in cash.

## **LEGAL STANDARD**

Pursuant to 18 U.S.C. § 3142(e)(3)(A), there exists a rebuttable presumption as to all the defendants that no conditions or combinations of conditions can effectively ensure the defendants' appearance in this case and otherwise protect the community.  By itself, an indictment establishes that probable cause and triggers the presumption.  *See*, *e.g., United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("the indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community").

The government must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988). For a detention decision based upon risk of flight, the government only need prove by a preponderance of the evidence that there are no conditions or combinations of conditions that will assure the defendant's appearance as required.  *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986). Furthermore, at a detention hearing, the government may present evidence by way of a proffer.  *Smith*, 79 F.3d at 1209-10.

In considering whether there are conditions of release which will reasonably assure the safety of any other person and the community, and the appearance of the defendant as required, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.  *See* 18 U.S.C. § 3142(g).

## ARGUMENT

### The Defendants Should Be Detained Pending Trial Because They Pose a Danger to the Community and Risk of Flight

In light of the nature and circumstances of the offenses charged, the weight of the evidence against each defendant, each defendant's criminal history and characteristics, and the dangers to the community posed by any defendant's release, the defendants cannot overcome the presumption that their release would endanger the community.

### A.      The Nature and Circumstances of the Offense

The nature and circumstances of the charged offenses weigh in favor of detention for several reasons. The grand jury found probable cause to believe that all eight defendants were engaged in one or more conspiracies, to distribute (1) 400 grams or more of a mixture and substance containing a detectable amount of fentanyl and 100 grams or more of heroin; and/or (2) 500 grams or more of a mixture and substance containing a detectable amount of cocaine, and a detectable amount of cocaine base. Fentanyl, heroin, and cocaine are dangerous drugs that are devasting local communities, causing overdose deaths, and facilitating violence (both domestic and drug-rival related).  Fentanyl alone is responsible for the death of over 70,000 people in our country every year.  As explained above, the defendants obtained, distributed, and redistributed kilogram quantities of controlled substances throughout the Washington, DC area.

The charges against the defendants expose them to serious periods of incarceration, particularly in light of the fact that nearly all of them have significant criminal histories.  Based on the narcotics conspiracy charges alone, nearly every defendant faces up to life in prison under 21 U.S.C. § 841(b)(1)(A)).  Finally, the fact that law enforcement found additional narcotics and firearms when executing its arrest and search warrants, and recovered additional evidence that is still being evaluated, makes the probability of a Superseding Indictment more likely in this case, which could subject the defendants to even higher penalties, increasing their risk of non-appearance.

### B.  The Weight of the Evidence Against Each Defendant

The evidence against each defendant is extremely strong.  As noted in Table 1 and Table 2, law enforcement has recovered more than eight kilograms of fentanyl associated with the fentanyl conspiracy, either purchased directly from Defendant STEWART or intercepted en route to Defendants ROGERS and GLYMPH.  This is not to mention the more than eight kilograms of cocaine, substantial additional quantities of fentanyl, and eight firearms recovered in the execution of search warrants on November 29, 2023.   Six kilograms of cocaine, plus a firearm, were recovered from QUATTLEBAUM alone.

Aside from the sheer weight of the drugs tied to the Defendants' conspiracies, each defendant was captured on numerous intercepted telephone calls, discussing drug shipments and drug distribution.  These calls establish the Defendants' participation in the conspiracy.

### C.  The History and Characteristics of the Defendants

The history and characteristics of the defendants also weigh in favor of detention. All eight defendants have felonies and prior convictions, and all four defendants contesting detention have substantial criminal histories.

### 1)  Wayne GLYMPH

According to the Pretrial Services Report (PSR) for Wayne GLYMPH, Defendant GLYMPH has five prior convictions dating back to 1986, three of which are either for drug trafficking or violent offenses.  His most recent conviction, for Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, 21 U.S.C. § 846—the very same offense with which he is charged in this case—was in federal court in Maryland in 2013.  In that case, GLYMPH was also convicted of being a felon in possession of ammunition under 18 U.S.C. § 922(g). GLYMPH was sentenced to 120 months in prison; he was granted compassionate release in 2020 and placed on supervised release.  Notably, GLYMPH's supervised release for this drug offense was terminated early on August 8, 2022—just weeks before a wiretap captured him arranging for the delivery of a kilogram of fentanyl.

Nor was the 2013 conviction his first major drug conviction.  GLYMPH was sentenced in 1990 in Virginia for possession with intent to distribute cocaine, and was sentenced to 10 years imprisonment, with five years suspended.

Defendant GLYMPH is a recidivist with a history of serious and high-level drug offenses. This factor weighs in favor of detention.

### 2)  Ricky JACKSON

The PSR for Ricky JACKSON reveals eight prior convictions dating back to a 1980 conviction for Voluntary Manslaughter and Armed Robbery.  At least three of his other prior convictions are for drug trafficking offenses and a fourth is a federal drug felony.  The PSR and other court documents also suggest that JACKSON was arrested in 2012 for possession of more than 50 grams of heroin while on pretrial release for a different heroin possession charge.  Given this history of serial drug trafficking crimes, including while facing other drug charges, his release

in this case would endanger the community.  This is amplified by the fact that JACKSON was one of the most prolific fentanyl redistributors for ROGERS in the fentanyl conspiracy and appears to have preyed on opioid addicts seeking help at methadone clinics.

### 3)  Kevin QUATTLEBAUM

Kevin QUATTLEBAUM's criminal history dates back to 1986 (a cocaine charge).  He was most recently sentenced in this Court to 126 months in prison in 2008 for possession with intent to distribute 50 grams or more of cocaine base, under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii).  His supervised release for this conviction was terminated in 2019.  In the interim between the 1986 cocaine conviction and the 2008 federal drug trafficking conviction, QUATTLEBAUM had two other convictions, including on an ammunition charge in 2002.

QUATTLEBAUM's prior federal drug trafficking conviction and his several other convictions, coupled with his present drug trafficking indictment and the six kilograms of cocaine, firearm, and $35,000 in cash found in his possession at his home at the time of his arrest, weigh heavily in favor of pretrial detention in this case.

### 4)  Michael STEWART

Defendant STEWART's PSR reflects three prior convictions dating back to 1985 when he was convicted of Felony Murder and Transporting a Handgun.  Additionally, the evidence in this case establishing that STEWART distributed more than 320 grams of fentanyl and his involvement in fentanyl and cocaine conspiracies that have resulted in his indictment for no less than five mandatory minimum charges, show that his release would endanger the community.

Based on each defendants' personal history and characteristics, the presumption that they are a risk of flight and danger to the community is correct.

**D. The Nature and Seriousness of the Danger to Any Person or the Community Posed by the Person's Release**

The fourth factor–the nature and seriousness of the danger to any person or the community posed by the person's release–also weighs in favor of detention.  Each defendant's release poses a physical danger to the community.  Here, the defendants have been charged in two large drug trafficking conspiracies that are having a horrifying impact on the local community.  Under the Bail Reform Act, 18 U.S.C. §§ 3142 et seq., "[t]he statutory language, as well as the legislative history, unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985).  Its legislative history also "fully supports the conclusion that Congress intended to equate drug trafficking with danger to the community."  *Id.* at 507.  As noted by the D.C. Circuit, Congress included the rebuttable presumption covering serious drug trafficking offenses because:

> 'Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism. Furthermore, the Committee received testimony that flight to avoid prosecution is particularly high among persons charged with major drug offenses. Because of the extremely lucrative nature of drug trafficking, and the fact that drug traffickers often have established substantial ties outside the United States from whence most dangerous drugs are imported into the country, these persons have both the resources and the foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences.'

*United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203).  In creating a presumption of pretrial detention for serious drug trafficking offenses, both the legislative history and the statutory language make clear that very "real-world" concerns lie behind the recognition of the inherent, pretrial dangers and flight risks posed by those who commit serious drug trafficking offenses.

The discovery of additional drugs, and of firearms, during the execution of search warrants at Defendants' residences strengthens this argument.  Defendants' conduct has been ongoing and, as with many serious drug conspiracies, is backed by the threat of violence.  Each defendant's release would pose a serious danger to the community.

## CONCLUSION

For the reasons noted above, the government respectfully submits that clear and convincing evidence establishes that there are no conditions or combinations of conditions that will reasonably assure the safety of any other person and the community. The government also submits that a preponderance of the evidence establishes that each defendant is a serious risk of flight and no conditions or combinations of conditions will assure their appearance in Court.  Accordingly, the government respectfully requests that the Court grant the government's motion to detain each defendant pending trial in this case.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

*/s/ George Eliopoulos*
GEORGE ELIOPOULOS
D.C. Bar Number 390601
WILLIAM G. HART
D.C. Bar Number 1029325
ADAM L.D. STEMPEL
D.C. Bar Number 1615015
Assistant United States Attorneys
Violence Reduction and Trafficking Offenses
601 D Street, NW
Washington, D.C. 20530
Phone: (202) 252-6957
george.p.eliopoulos@usdoj.gov
william.hart@usdoj.gov
adam.stempel2@usdoj.gov

26

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2023, a copy of the foregoing Memorandum was submitted via CM/ECF, which will transmit to counsel for the above-captioned defendants.


*/s/ George Eliopoulos*
Assistant U.S. Attorney